## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **NILDA MARTINEZ,** | : | |
| **PLAINTIFF,** | : | |
| | : | **CIVIL ACTION NO. 3:09cv1341(VLB)** |
| | : | |
| **v.** | : | **SEPTEMBER 21, 2011** |
| | : | |
| **STATE OF CONNECTICUT,** | : | |
| **STATE LIBRARY** | : | |
| **DEFENDANT.** | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S [DOC. #32] MOTION FOR SUMMARY JUDGMENT

Before the Court is a motion for summary judgment filed by the Defendant, State of Connecticut State Library. The Plaintiff, Nilda Martinez ("Martinez"), brings this action for monetary damages against her current employer, the State of Connecticut State Library. The Plaintiff alleges claims of discrimination, retaliation, and hostile work environment based upon her race, ethnicity and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000 *et. seq.* (Count One). The Plaintiff further alleges discrimination, retaliation, and hostile work environment in violation of the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq.* due to the Defendant's purported unwillingness to accommodate her chronic asthma (Count Two), and discrimination, retaliation, and hostile work environment in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.* (Count Three). In addition, the Plaintiff asserts a cause of action for intentional infliction of

emotional distress (Count Four).  For the reasons stated hereafter, Defendant's motion for summary judgment is granted.

### Facts

The following facts relevant to Defendant's motion for summary judgment are undisputed unless otherwise noted.  Martinez is a Hispanic female, born in Puerto Rico and a citizen of the State of Connecticut.  [Doc. #32].  In May of 1988, Martinez began working with the Connecticut Library for the Blind and Physically Handicapped, which is a part of the Connecticut State Library system.  [*Id.*].

Martinez was hired as a "clerk typist," and she remained employed in that classification at all times relevant to the motion for summary judgment.  Martinez alleges that she is working outside of her job classification and asserts that her assigned duties including filing, transfers, answering phones, annotating books, and dealing with the mail are not within the "clerk typist" job classification.  [Doc. #1, Complaint at ¶ 5 and Doc. #43].  In September of 1996, Martinez filed an internal grievance asserting her belief that she was forced to work outside of her job class; however, after performing an independent investigation, the State Library's Principle Personnel Officer and the State Department of Administrative Services ("DAS") hearing office found that she was working within her class and her grievance was denied in April of 1997.  [Doc. #32].  Martinez filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in April of 2009 asserting the she was working outside of her job classification and on April 29, 2009, the CHRO also found that Martinez was working within her

class.  [Doc. #32, Ex. C, CHRO Report Summary at 25].  In addition, Martinez alleges that her supervisor, Carol Taylor ("Taylor") "unlawfully prevented plaintiff from obtaining a class update."  [Doc. # 43].  However, the testimony Plaintiff cites in support of this allegation relates to Martinez's grievance that she was working out of class.  *See* [Doc. 34, Martinez Dep. at 74-78 and 145-156].  Martinez alleges that after this complaint regarding her job classification her workload increased and she was denied training.  [Doc. #43 and Doc. #34, Martinez Dep. at 130].

Since 1989, Mary Minow ("Minow") has been a coworker of Martinez.  Minow is a white, non-Hispanic female, and employed as a Library Technical Assistant. [Doc. #32].  Martinez's supervisor Taylor is also a white, non-Hispanic female.  Taylor began working with the Library in 1989 as State Library Unit Head and continued in that position at all times relevant to this motion.  [Doc. #32, Ex. B, Taylor Aff. ¶ 3].  Martinez alleges that both Minow and Taylor subjected her to a hostile work environment.  [Doc. #43, Doc. #1 Complaint ¶ 7].  Martinez's assertion is based on nine derogatory comments made about her Hispanic ancestry and race by Minow: "I cannot believe these stupid people, they come to America, sometimes they do better than us.  They do not even speak fluent English, but they want to take over;" "She wants to look like us.  She does not understand slang, so you can get away with insulting her by using slang and she would not know what you are talking about;" "Their families are broken, the men beat the women, their children are illiterate;" "How can she pass those classes to get an Associates Degree, if she can hardly speak the language?;" a joke about

Martinez's deviled egg dish which Martinez had used to serve the "Puerto Rican desert flan;" a comment that Martinez would be unable to keep the house that she bought, that Minow would call Martinez stupid; and Minow made a remark mocking Martinez for being in a coma. [Doc. #43]. Martinez did not specify the dates when these comments were made nor did she specify if the comments occurred on the same day or over a period of days, weeks, months or years.

Martinez also alleges that Minow once approached Taylor while Martinez was within earshot and said "Cheers" in regard to the death of Martinez's brother. [Doc. #43]. Martinez does not state what Minow said to lead her to believe the comment was made in reference to her brother. In addition, Martinez alleges that "Minnow [sic] knows when the plaintiff is crying even though the plaintiff is trying to hide it. Mary looks for opportunity to make we [sic] a fool of the plaintiff or to laugh at or to make fun of her" and that Minow made fun of Martinez's accent. [*Id.*]. In her deposition, Martinez was asked to give examples of Defendant's harassing behavior and she testified that once at a pizza party, "there was only one chair that was empty that I assumed that was my chair. And that chair was just facing the – the wall, and it was like saying you're segregated … it is like telling me you cannot sit with the others." [Doc. #34, Martinez Dep. at 186].

Martinez alleges that Taylor "witnessed many of these comments and failed to prevent, stop or address them in any manner whatsoever, despite plaintiff's upset and distress. Instead, Taylor laughed at the offensive remarks." [Doc. #43]. However, Taylor denies this and asserts that she was not aware that Minow harassed Martinez at any time and that she did not witness or laugh with Minow

at any harassing comments toward Martinez.  [Doc. #32, Ex. B, Taylor Aff. ¶ 23, 26].  Taylor further states that she overheard Minow's coma comment; however, she did not think that it was directed at Martinez or anyone in particular.  [*Id.* at Taylor Aff. ¶ 25].

The Defendant also highlights that Minow, Taylor and Martinez had a good working relationship for many years.  Martinez stated in her deposition that she was friends with both Minow and Taylor, and she further indicated her then present affection by stating "I love Carol Taylor.  I'm sorry. I have to say yes." With respect to Mary Minnow she spoke in the past tense testifying that "Mary was one of my favorites in there.  I was always looked up to her."  [Doc. #34, Martinez Dep. at 110, 123].  Furthermore, Martinez testified that she gave them both birthday cards and that she gave Minow a gift.  [*Id.* at 120 – 123].  The record is unclear as to when the comments were made by Minow in relation to the card and gift giving.  [*Id.*].

Martinez was diagnosed with chronic asthma in 1996.  She alleges that her asthma is so severe on one occasion it caused her to lapse into a coma.  [Doc. #43.].  The Defendant was aware that Martinez had asthma, however the Defendant disputes the severity of her asthma.  Martinez asserts that she gave Taylor a doctor's note stating that she could not be exposed to excessively cold conditions; however, Taylor states that she never received this note. [Doc. #34, Martinez Dep. at 199 – 200; Doc. #32, Ex. B, Taylor Aff. ¶ 33].  In July or August of 2006, Martinez complained to Taylor that the cold temperature in the library aggravated her chronic asthma.  [Doc. #43].  In response, Taylor adjusted the

building temperature to the extent possible.  When Martinez complained about the cold in the winter of 2005-2006, Martinez was told on March 30, 2006 that she could have a portable heater at her desk.  [Doc. #34, Martinez Dep. at 203]. Martinez acknowledged in a handwritten note that Taylor informed her that she was unable to adjust the building temperature and that she was allowed to bring in a heater. [*Id.*].  Nevertheless, Martinez alleges that Taylor once raised the temperature per the request of a white supervisor in late 2006.  [Doc. #43]. Martinez also admitted in her own deposition testimony that the cold building temperature did not really affect her ability to perform her job functions.  [Doc. #34, Martinez Dep. at 204].  The record is devoid of any facts concerning the exact or even approximate building temperature on any date.

Martinez also generally alleges that she filed complaints of discrimination and harassment and as a result her workload increased.  [Doc. #43].  Besides her grievance that she was working out of her job classification in 1996, Martinez during her deposition only identifies one other time she complained about Minow and Taylor's behavior.   Martinez alleges that around July 2006 she complained to her union representative Nancy Buckland that Minow and Taylor discriminated against and harassed her and that Buckland created a written grievance which Martinez signed.  However, Martinez testified that she did not know if the grievance was filed.  In particular, Martinez testified that it was her belief that Buckland "never filed it, but it's been written" [Doc. # 34, Martinez Dep. at 91-92].

On October 18, 2006, both Martinez and Minow attended a training session related to the new libray telephone system.  [Doc. #32].  The training session was

led by Taylor.  During this session, Taylor explained the library procedure regarding calling in sick.  At this time, Minow made a remark that employees, when sick, must call-in "unless they are in a coma." [*Id.*].  Martinez alleges that this comment was a personal insult to her disability a she was once in a coma as a result of an asthmatic attack.  [Doc. #43].  This was the comment Taylor acknowledges hearing Minow say, but denies that it was in reference to Martinez.  There are no facts in the record of the temporal proximity of Martinez's coma and the comment.

Later that same day, at approximately 4:00 PM, Martinez confronted Minow about the coma comment in a bathroom and both women became upset. [Doc. #32].  After, the conversation became mutually heated, Martinez and Minow left the bathroom and immediately went to Taylor's office, and Taylor observed that both were very upset and speaking loudly at the same time. [Doc. #32, Ex. B, Taylor Aff. ¶10].  Minow entered Taylor's office first, followed by Martinez.  Martinez alleges that Taylor yelled at Martinez to get out of her office, but allowed Minow to remain and told Minow that she would take care of her.  [Doc. #43 and Doc. #1, Complaint ¶ 18].  She further alleges that Taylor physically pushed her out of her office. [Doc. #43 and Doc. #1, Complaint ¶ 19]. Taylor asserts, however, that the altercation caused Taylor "great concern," and she as calmly as possible asked Martinez to leave her office in an effort to keep the situation from escalating further.  [Doc. #32, Ex. B, Taylor Aff. ¶ 10].  Taylor stated that she asked Martinez to leave first because Martinez was closest to the door.  [*Id.* at Taylor Aff. ¶ 11].  She further asserts that Martinez refused to leave and began to

yell at Taylor. [*Id.* at Taylor Aff. ¶ 13]. After repeated requests, and after calling for the help of her assistant, Taylor guided Martinez out of office. [*Id.* at Taylor Aff. ¶ 13-14]. Defendant alleges that Martinez herself later demonstrated before two internal investigators that Taylor guided her out of her office by placing her palms on Martinez's shoulders and gently pushing, however not with enough force to move the body. [*Id.*]. Taylor immediately sent both Minow and Martinez home for the day, and after they left Taylor called Louise Carey ("Carey"), Principal Human Resources Specialist at the Connecticut State Library, in order to report the incident in compliance with the State's Zero Tolerance Policy for Workplace Violence. [Doc. #32, Ex. B, Taylor Aff. ¶ 15]. Carey was out of her office at the time, however, so the incident was immediately reported to the Fiscal Administrator Manager in her stead. [*Id.*].

According to statewide policy, an investigation must occur once there has been a complaint of violence in the workplace and there is no room for a supervisor's discretion. [Doc. #32, Ex. C, Carey Aff.]. The investigation was conducted by Carey. Carey's office is located in Hartford and at no time has she worked in the same building as Martinez, Minow, or Taylor. [Doc. #32, Ex. C, Carey Aff. ¶ 5]. Carey ultimately interviewed Martinez twice as a part of her investigation and Martinez's union representative was present at both times. Carey also interviewed Minow, Taylor, and several other employees who work at the library during her investigation. [Doc. #32]. It was during this investigation that Martinez raised her claim of race-motivated harassment against Minow, and did so after being notified by Carey that Minow was alleging that the bathroom

incident was the result of a pattern of harassment perpetrated by Martinez. [Doc. #32, Ex. C, Carey App. ¶ 14].

In the course of Carey's investigation, Martinez admitted that she followed Minow into the bathroom for the purpose of confronting Minow about the coma comment that she had made during the training session. [Doc. #32, Ex. C, Carey Aff. ¶16]. Carey prepared a validated statement of her investigative interview which was reviewed and signed by Martinez. The validated statement indicated that Martinez had followed Minow into the bathroom to "talk with her about the comments" and that she wanted to speak with Minnow "in the bathroom because it would be more private," which she reiterated in her deposition testimony. [Doc. #34, Martinez Dep. 215-216]. After the investigation was completed, Carey concluded, among other things, that (1) Martinez intimidated a coworker, failed to follow a directive from her supervisor and violated the Connecticut State Violence in the Workplace Prevention Policy and (2) there was no evidence the Martinez was subjected to harassment, discrimination, or disparate treatment. [Doc. #32, Ex. C, Carey Aff. ¶ 18].

Once she concluded her investigation, Carey contacted Paul Bodenhofer ("Bodenhofer"), Labor Relations Specialist with the State of Connecticut, Office of Labor Relations, and Susan Phillips ("Phillips"), Principal Human Resources Specialist for the Office of the State of Connecticut Secretary of State, to discuss her investigative summary and seek recommendations for the appropriate discipline. Phillips met with Carey on November 16, 2006 and the conversation with Bodenhofer occurred on December 12, 2006. [Doc. #32, Ex. D, Phillips Aff.

¶¶5, 8 and Bodenhofer Aff. ¶¶7-9]. Phillips recommended that the State Library consider suspending Martinez for a day without pay, and Bodenhofer stated that the incident was serious and warranted significant discipline at the level of suspension. [*Id.*]. On December 12 2006, Bodenhofer recommended that it would be appropriate to reduce the discipline to a written warning if Martinez agreed to a management referral to the Employee Assistance Program ("EAP") and would agree to follow their recommendations, if any. [*Id.*].

Martinez filed an Affidavit of Illegal Discriminatory Practice with the CHRO on December 14, 2006 which was two days after Bodenhofer and Carey came to a preliminary agreement regarding Martinez's discipline. Martinez alleges after she filed the CHRO complaint her workload increased and that she was further harassed by Minow and Taylor. [Doc. #43].

Martinez received notice on January 2, 2007 that a pre-disciplinary meeting ("Loudermill Hearing") was going to be held on January 10, 2007. [Doc. #32]. Martinez, accompanied by Debbie Austin ("Austin"), the president of her union, was given the opportunity at this meeting to respond to the charges and present any evidence on her behalf. No new evidence was presented. [Doc. #32, Ex. C, Carey Aff. ¶28-31]. Martinez alleges that "at the hearing, the defendant tried to compel [her] to give up her rights under state and federal law, including withdrawing her pending CHRO complaint, in return for dropping the false claims against her." [Doc. # 43 and Doc. #1, Complaint ¶25]. In her deposition testimony, Martinez clarified that allegation by stating that it was Austin who wanted her to "give up her rights." [Doc. #34, Martinez Dep. 231]. Martinez did

not clarify what she meant by "give up her rights," but upon questioning she discussed that she subjectively felt that Austin was in "collaboration" with Carey, "holding secret meetings" while Martinez was waiting for their help in filing a formal grievance against Taylor and Minow.  [*Id.*].

During the hearing, Defendant presented Martinez with a stipulated agreement in which they proposed to lower the discipline to a written warning if Martinez agreed to a management referral to EAP.  Notably, the agreement expressly stated that "[t]his agreement would not prohibit Ms. Martinez from pursuing her current claim with CHRO."  [Doc. #32, Ex. C, Stipulated Agreement].

Twelve days later, on January 22, 2007, Martinez refused this offer and was given a one-day suspension without pay as a result of the October 18, 2006 incident.  [Doc. #32, Ex. C, Carey Aff. ¶¶33-34].  Martinez also alleges that she was forced to sign a letter confirming her acknowledgement of her one-day suspension under threat of discharge.  [Doc. #43 and Doc. #1 Complaint ¶26].  However, Martinez clarified this allegation in her deposition and testified that Austin told her that, "Well, listen, you know what, you either sign or you're going to have to go because these people don't want—don't want to wait and I cannot wait either." [Doc. #34, Martinez Dep. 235].   Martinez testified that she interpreted this comment as "It was, like, you sign or you out." [*Id.*].

 The CHRO made a Finding of No Reasonable Cause on April 29, 2009. Martinez received a right to sue from the EEOC on May 28, 2009 and filed her complaint in the District of Connecticut on August 24, 2009.

**Legal Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted). In addition, "[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted).

## Analysis of Title VII Employment Discrimination Claim

Martinez alleges that the Defendant discriminated against her by unlawfully preventing her from obtaining a class update and suspending her for a day

without pay on the basis of her race and national origin. Under Title VII, Plaintiff's claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802 (1973). The *McDonnell Douglas* standard requires that Plaintiff establish a *prima facie* case of discrimination by showing that (1) she is part of a protected class; (2) that she was qualified for his position; (3) that she suffered an adverse employment action and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination. *Id.* The Second Circuit has noted that the burden to establish a prim facie case is "minimal" or "de minimis." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

If Plaintiff can establish a *prima facie* case, the burden shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell*, 411 U.S. at 802. As this stage, Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision. *See Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). "This burden is one of production, not persuasion, it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted).

If Defendant meets its burden of production, the burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination. *McDonnell*, 411 U.S. at 804. "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

The Defendant challenges the Plaintiff's Title VII race claim on the basis that Martinez's EEOC right to sue notice referred only to "national origin," and therefore her Title VII claim must fail in regard to "race" because she failed to exhaust administrative prerequisites. The Court does not find this fact to be fatal to Martinez's claim as the Second Circuit has held that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency. A claim is reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Deravin, III v. Kerik*, 335 F.3d 195, 200-201 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also Alonzo v. Chase Manhattan Bank N.A.*, 25 F. Supp. 2d 458, 460 (S.D.N.Y. 1998) (holding that a race discrimination claim was reasonably related to a national origin claim because "it has not been established that the designation of being an Hispanic precludes a claim of racial discrimination, given the uncertainty among courts as to whether 'Hispanic' is better characterized as race or a national origin.").

Martinez has satisfied the first two prongs of her *prima facie* case as it is undisputed that she is a member of a protected class and there is no evidence in the record suggesting that she is not qualified for her position.

i.    Analysis of Whether Martinez Suffered an Adverse Employment Action

Martinez alleges that she was forced to work outside of her class when she was required to do such additional tasks as filing, transfers, answering phones, annotating books, and dealing with the mail and that she was denied a class update by Taylor in connection with this grievance. [Doc. #43]. From the evidence in the record, it appears that Martinez's allegation regarding the denial of a class update is focused solely on her allegation that she was working out of her job classification. The Court notes that Defendant argues that to the extent that Martinez is alleging that she was denied a class update prior to February 17, 2006 that claim should be time barred. However, Martinez does not specify the exact dates when she was denied updates and therefore the Court in viewing the facts in the light most favorable to the non-moving party assumes that Martinez's claims were timely filed.

To suffer an "adverse employment action," Martinez must have suffered something more than an unpleasant situation. She must point to evidence of more than inconvenience; she must show an action that rises to the level of "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks and citation omitted). In addition, the Second Circuit has held that for conduct to constitute an adverse employment action, it must be a "materially adverse change in the terms and conditions of employment." *Galabaya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.

2000).  In support of this claim, Martinez relies on her deposition testimony that consists solely of conclusory accusations of discrimination and her unsubstantiated belief that she was subject to pervasive discrimination and harassment.  The only factual support for this claim is her unverified complaint in which she asserts that she has been forced to perform additional duties such as filing, transfers, answering phones, annotating books, and dealing with the mail.  Contrary to Martinez's belief, the defense offers public records which establish that these responsibilities are within the job classification of "clerk typist" as outlined in the Department of Administrative Service's ("DAS") Class Specification dated May 26, 2009 and the DAS Job Description dated December 19, 1997.  [Doc. #32, Ex. B].  Both of these documents describe the "purpose of the class" as "accountable for performing a full range of general clerical functions" [*Id.*].  They also contain an in-exhaustive list of the duties of the class which include "basic processing, reception, filing, record keeping, bookkeeping, and typing" as well as assisting in maintaining inventory and ordering supplies.

The Defendants also offer evidence that after Martinez filed a grievance in September of 1996, DAS conducted an independent investigation and found that Martinez was working within her job classification and that CHRO later concurred. [Doc. #32, Ex. B, CHRO Report Summary].  Moreover, Martinez does not challenge either of these investigations or their conclusions.  Plaintiff alleges in her Local Rule 56(a)2 Statement that "plaintiff has sought an increase in job class through DAS, which found that she is working out of class" [Doc. #43].  However, the testimony which Plaintiff cites in her Local Rule 56(a)2 Statement does not

support this allegation as Martinez testified that it was not DAS but her union steward Mary King who concluded that she was working out of class. [Doc. #34, Martinez Dep. at 77-78]. The Court finds that a rational jury when viewing the evidence in the record could not conclude that Martinez was working out of her classification and therefore the Court finds there are no genuine issues of material fact in dispute with respect to Martinez's allegation that she was discriminatorily denied a class update. Accordingly, Martinez has not provided sufficient evidence to demonstrate that she suffered an adverse employment action in connection with her claim that she was denied a class update. Defendant's motion for summary judgment on Martinez's claim based on a denial of a class update is granted.

Martinez also asserts that Defendant failed to provide her with training despite her requests. [Doc. #43]. To the extent that Martinez is asserting that the failure to provide training was an adverse employment action she cannot do so as Martinez failed to raise this claim in her complaint and it is well established that "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion" *Thomas v. Egan*, 1 Fed.Appx. 52, 54 (2d Cir. 2001); *Lyman v. CSX Transp., Inc.*, 364 Fed.Appx. 699, 701 (2d Cir. 2010) (finding that district courts are "'justified' in 'brushing aside' further argument not alleged in complaint but raised for first time in opposition to summary judgment")(*quoting Syracuse Broad. Corp. v. Newhouse*, 236, F.2d 522, 525 (2d Cir. 1956)); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1183, at 23 n.9 (3ed.2004) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims.").

Martinez also alleges she suffered an adverse employment action when she was suspended without pay in connection with the bathroom altercation with Minow. The Court notes that Martinez was given the opportunity at the hearing to receive a written warning instead of a one-day suspension without pay if she agreed to a management referral to the EAP and that written warnings alone do not constitute adverse employment actions. See *Abraham v. Potter*, 494 F. Supp. 2d 141, 147 (D. Conn. 2007) (Courts in this circuit have found that "reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.") (internal quotation marks and citation omitted). By refusing to accept the referral to the EAP, Martinez elected the higher level of discipline she received by refusing discipline which did not constitute an adverse employment action. The Court notes that Martinez's role therefore should undermine a conclusion that Defendant took an adverse employment action against her.

In addition, courts in the Second Circuit have found that a suspension without pay in certain circumstances can constitute an adverse employment action. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-224 (2d Cir. 2001) (holding that one-week suspension without pay is adverse action, even if pay is later reimbursed, because plaintiff "at least suffered the loss of the use of her wages for a time"); *Page v. Connecticut Dep't of Pub. Safety, Div, of State*

*Police*, 185 F.Supp.2d 149, 157 (D. Conn. 2002) ("In this case, plaintiff was suspended for two days without pay. Thus, she lost wages. She was also orally counseled for three alleged incidents of unacceptable work behavior and then reprimanded in writing. These would be sufficient to support a jury's finding that she suffered adverse employment action.").

While the Second Circuit has not yet decided whether a one-day suspension without pay alone constitutes an adverse employment action, district courts within the Circuit have come to different conclusions on the issue. One court in the Southern District of New York has suggested but did not decide that a one-day suspension without pay could constitute an adverse employment action. *Satterfied v. United Parcel Serv., Inc.*, No.00CIV.7190, 2003 WL 22251314, at *10 (S.D.N.Y. Sept. 30, 2003) ("[a]s for [plaintiff's] one-day suspension, this action arguably does fall within the Second Circuit's definition of 'materially adverse' action since plaintiff presumably was forced to forego one day's worth of wages") (*citing Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-224 (2d Cir. 2001)). In addition, another court in the District of Connecticut found that a one-day suspension without pay in connection with other disciplinary measures could be considered an adverse employment action. *Cormier v. City of Meriden*, 420 F. Supp.2d 11, 21 (D. Conn. 2006) (finding that "the one-day suspension without pay, which also resulted in a one-year loss of eligibility for the crew-leader premium, and the written disciplinary letters, which were placed in plaintiff's personnel file, can be considered adverse employment actions"). In contrast, a court in the Southern District of New York concluded that a one-day

suspension without pay did not as a matter of law constitute an actionable adverse employment action because it was not material. *Dobrynio v. Central Hudson Gas & Electric Corp.*, 419 F.Supp.2d 557, 564-565 (S.D.N.Y. 2006) (holding that "I reject as a matter of law Plaintiff's contention that the loss of one day's pay worked a substantial change in the terms and conditions of his employment. Indeed, it did not work any change in the terms and conditions of his employment at all! Plaintiff was suspended for a day: he did not work; he was not paid for staying home on the day of his suspension. When he returned after one day off the job, it was to the same position, with the same title and office, at the same salary, with the same duties and perquisites. An employee will no doubt view suspension, for whatever reason (including the most justified discipline), as an *adverse* employment action. But being suspended for a single day, with no long term consequences whatever, is not an actionable adverse employment action because it is not *material.*") (emphasis in the original). The Court finds the *Dobrynio* court's reasoning persuasive. Here, Martinez did not suffer any other short term nor any long term consequences as a result of the suspension nor did she suffer a material change in the terms and conditions, benefits or responsibilities of her employment. Like *Dobrynio*, Martinez returned after her one day off to the same job, the same position, the same title, the same duties and the same salary. Here as well, Martinez elected a one day suspension, rejecting a less onerous and beneficial alternative. Accordingly, the Court finds that Martinez did not suffer an adverse employment action when she was suspended without pay for one day. However, assuming arguendo that Martinez

did suffer an adverse employment action, while Martinez could likely demonstrate that the circumstances surrounding the suspension gave rise to an inference of discrimination, she would be unable to rebut Defendant's proffered legitimate non-discriminatory reason and demonstrate that such reason was a pretext for discrimination.

ii.  **Analysis of Whether the Circumstances Surrounding Martinez's Suspension Without Pay Gives Rise to an Inference of Discrimination.**

Here, Martinez alleges that an inference of discrimination can be drawn from the fact that Minow had made racist comments to Martinez in which Taylor acquiesced and therefore both Minow and Taylor displayed a discriminatory animus. While neither Taylor nor Minow were involved with the decision to suspend Martinez, Martinez alleges that Minow essentially provoked the bathroom altercation when she made the coma comment and Taylor, as Martinez's supervisor, initiated the investigation which led to Martinez's suspension without pay. Arguably, Minow's alleged comments and Taylor's alleged acquiescence to those comments could be considered stray remarks as neither were involved in the decision to suspend Martinez. "Stray remarks by an employer do not prove discriminatory animus unless there is a causal connection to plaintiff's alleged adverse employment action." *Trojanowski v. Blakeslee Prestress, Inc.*, No. 3:08cv548 (WWE), 2009 WL 3340426, at *4 (D. Conn. Oct. 15, 2009). However, when viewing the facts in the light most favorable to the non-moving party, the Court finds that the central involvement of both Minow and Taylor in the incident that sparked the investigation that led to Martinez's suspension supports a "de minimus" inference of discrimination. *See Jasmin v.*

*New York State Dept. of Labor*, No.04 Civ.10237, 2007 WL 1746909, at *7 (S.D.N.Y. June 15, 2007) (concluding that the "gravamen of Plaintiff's evidentiary support here is alleged discriminatory and threatening remarks made by [a supervisor]. Although Plaintiff has proffered no specific evidence of [the supervisor's] involvement in the pre-termination investigation, the time falsification charges or the termination decision, the Court will assume for purposes of this analysis that the temporal relationship among the alleged remarks, the various proceedings and the termination is sufficient to support an inference of improper motivation."). Here as in *Jasmin*, the temporal proximity of the remark in Taylor's presence to the initiation of the investigation and suspension is sufficient for purposes of this analysis to create an inference of improper motivation.

The Court notes that Defendant argues that to the extent that Plaintiff alleges that these comments by Minow were made before February 17, 2006 they are barred as untimely as Title VII requires a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action. Civil Rights Act of 1964, § 706(e), 42 U.S.C.A. § 2000e-5(e). However, Defendant's argument is misplaced as Martinez is citing to those comments to prove an inference of discrimination and to rebut Defendant's legitimate non-discriminatory reason and is not asserting that the unlawful employment action which is the basis of her claim was those discriminatory comments.

     iii.    **Analysis of Whether Defendant's Legitimate Non-Discriminatory Reason for Martinez's Suspension Was a Pretext for Discrimination**

The Defendant has a proffered legitimate, non-discriminatory reason for their adverse employment action. Defendant asserts that its decision to suspend Martinez was the result of a three-month formal investigative process led by the Principal Human Resources Specialist who did not work with Minow or Taylor, which consisted of the input of multiple supervisory administrators and a hearing where Martinez was provided with representation by her union and had the ability to present evidence on her own behalf. Defendant concluded after this formal investigation and hearing that Martinez's conduct violated the State's Violence in the Workplace Policy. Defendant's conclusion was in part based on Martinez's testimony during the investigation that she followed Minow into the bathroom for the sole purpose of confronting her regarding the coma comment. The Zero Tolerance Policy expressly defines violence to include "verbal abuse" and Martinez essentially admitted that she violated the policy when she intentionally confronted Minow in the bathroom. Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision. *See Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).

Since Defendant has proffered a legitimate non-discriminatory reason for its action, Martinez now has the burden to demonstrate that this reason was a mere pretext for discrimination. Martinez has failed to present sufficient evidence to rebut the weight of the defendant's legitimate reason to demonstrate pretext. Martinez once again relies on the nine discriminatory comments which Minow allegedly made and which she alleges that Taylor acquiesced in as evidence of pretext. However although Taylor responding to Martinez and Minow's entreaties

initiated the investigation of the altercation, neither Minow nor Taylor were involved in the decision to discipline Martinez.  Therefore Martinez cannot impute their alleged discriminatory animus to the individuals who actually made the decision to suspend her.  *Howe v. Town of Hempstead*, No.05CIV0656, 2006 WL 3095819, at *7 (E.D.N.Y. Oct. 30, 2006) ("Racist comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the adverse employment action.  This connection exists if the comments were made by the decision-maker or by someone who had great influence over the decision-maker.") (citation omitted).  The Court further notes that Minow's alleged comment regarding Martinez's brother's death is not related to Martinez's race or national origin nor do Martinez's allegations that Minow called her stupid and therefore do not support a finding of pretext.

In addition, Martinez attempts to rebut the Defendant's proffered reason with her own unsubstantiated belief that every individual including her own union representative involved in the investigation and hearing that led to her discipline was in collaboration against her.  Martinez offers no evidence admissible or otherwise to support her belief.  *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F. 3d 14, 18 (2d Cir. 1995) (A motion for summary judgment "will not be defeated merely ... on the basis of conjecture or surmise.") (internal quotation marks and citation omitted).  During her deposition, Martinez vaguely asserted that Austin, her union representative, was in collaboration with Carey.   However, Martinez provides no specific facts or evidence demonstrating that Austin was involved in the decision to discipline her, that Austin had or exerted any influence

over Carey Bodenhofer or Phillips, or that Austin was motivated by racial animus herself. *Harrison v. North Shore Unviersity Hosp.*, No.CV04-2033, 2008 WL 656674, at *13, (E.D.N.Y. March 6, 2008) ("Plaintiff's attempts to overcome the legitimate reasons advanced by defendant are conjectural and fall short of the mark. Again, he relies solely upon his statements that he was discriminated against. As discussed *supra,* he has provided no admissible evidence to support his allegations. An assumption devoid of evidence to support it is conclusory, and mere conclusory allegations" cannot establish a pretext to defeat a motion for summary judgment … As plaintiff has put forth no evidence to show that defendant's reasons for his termination were pretextual, there is no genuine issue of fact for a jury to determine.") (internal quotation marks and citations omitted).

Moreover, Martinez does not present any evidence that Carey, Bodenhofer, or Phillips—the individuals who actually investigated and disciplined Martinez— were motivated by racial animus. The only racial animus that Martinez has alleged was on the part of Minow and Taylor—two individuals who had no role in the decision-making that led to her suspension. *See Jasmin*, 2007 WL 1746909, at *7 (finding that Plaintiff's reliance on a supervisor's discriminatory comments to demonstrate pretext unpersuasive as "Defendant has proffered affidavits asserting that [the supervisor] was neither involved in the initiation of the investigation or the decision to issue the Notice of Discipline and denying that the decision was based on any consideration of Plaintiff's race, ethnic background, or any prior litigation or complaints brought by Plaintiff against DOL or any of its employees."). Moreover, Martinez presents no evidence that Minow

or Taylor had any influence over Carey, Bodenhofer, or Phillips. Martinez cannot rely on the alleged racists comments made by Minow and acquiesced to by Taylor absent some demonstration or nexus beyond her own unsubstantiated belief linking Minow and Taylor's alleged animus to Carey, Bodenhofer, or Phillips.

Further, Martinez attempts to establish pretext through her unsubstantiated allegation that "at the hearing, the defendant tried to compel [her] to give up her rights under state and federal law, including withdrawing her pending CHRO complaint, in return for dropping the false claims against her." [Doc. # 43 and Doc. #1, Complaint ¶25]. However this contention is soundly refuted by the record. Martinez's own testimony belies this allegation as she testified that it was her belief that Austin, her union representative, wanted her to "give up her rights" and not any of the individuals who made the decision to discipline her. [Doc. #34, Martinez Dep. 231]. During the deposition, Martinez was asked to further clarify what she meant by "give up her rights," and in response she discussed that she subjectively felt that Austin was in "collaboration" with Carey, "holding secret meetings" while Martinez was waiting for their help in filing a formal grievance against Taylor and Minow. [*Id.*]. Martinez has presented no evidence that Carey, Bodenhofer, or Phillips, who were involved in the decision to suspend her, tried to compel her to give up her rights under state and federal law. Moreover, this allegation is further undermined by the undisputed fact that during the hearing Defendant presented Martinez with a stipulated agreement in which they proposed to lessen the discipline to a written warning if Martinez agreed to a

management referral to EAP which agreement expressly stated that it did not prohibit Martinez from pursuing her CHRO claim. [Doc. #32, Ex. C, Stipulated Agreement].

Martinez also attempts to prove pretext through her unsubstantiated allegation that she was forced to sign a letter confirming her acknowledgement of her one-day suspension under threat of discharge. [Doc. #43 and Doc. #1 Complaint ¶26]. However, it is unclear to the Court how being forced to sign an acknowledgement of the undisputed fact that she received discipline demonstrates that the discipline was motived by discrimination. Furthermore, Martinez testified that the perceived threat came from Austin, her union representative and not from any the individuals who made the decision to suspend her. Lastly, it is unclear from Martinez's deposition testimony whether Austin actually ever threatened Martinez with discharge. In particular, Martinez testified that Austin told her "Well, listen, you know what, you either sign or you're going to have to go because these people don't want—don't want to wait and I cannot wait either." [Doc. #34, Martinez Dep. 235]. In her deposition, Martinez stated that she interpreted Austin's comment as "It was, like, you sign or you out." [*Id.*]. Martinez does not cite any admissible evidence to show that any defendant threatened her with termination.

Lastly, Martinez baldly alleges that "defendant was quite concerned that plaintiff would file a discrimination claim with the Connecticut Commission on Human Rights and Opportunities. On several occasions, the plaintiff was questioned about the matter, including being asked when and by whom her

complaint would be filed." [Doc. #43]. However after reading through the over forty pages of deposition testimony Plaintiff cites in support of this assertion, the Court finds no discernable basis for the assertion. At most, Martinez testified that her union representative Mary King – not the Defendant stated "come and tell me, Nilda, don't call me if you're don't gonna to file a grievance … I cannot continue coming here for nothing. If you want to file a grievance or what?" [Doc. #34, Martinez Dep. at 168-169]. Martinez also testified that it was her belief that Carey "didn't want me to get union representation." [*Id.* at 171].

Martinez has simply offered no evidence that would allow a reasonable jury to conclude that the decision to suspend her without pay was anything other than a genuine good-faith business decision. "As the Second Circuit has explained, although evidence showing that an employer made an erroneous or poor business decision is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons, there is a distinction between a poor business decision and a reason manufactured to avoid liability. In an ADEA or Title VII case, a plaintiff may be able to put into question the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise." *Barney v. Consolidated Edison Co. of New York*, No.CV-99-823, 2009 WL 6551494, at *17 (E.D.N.Y. Oct. 1, 2009) (internal quotation marks and citations omitted). Here, there is nothing in the record that would convince a reasonable jury that the decision to suspend Martinez was anything but a good-faith business decision as the decision was not implausible, absurd or unwise.

Martinez cannot rely on her hyperbolic and conclusory statements unsupported by admissible evidence that everyone was against her because of her race and national origin to rebut Defendant's non-discriminatory reason. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."). Considering the substantial evidence in the record documenting Martinez's inappropriate conduct which formed the basis of Carey, Bodenhofer, and Phillips decision to suspend Martinez and the lack of any nexus between the alleged racists comments made by Minow and the decision to suspend Martinez, it is unlikely that a reasonable jury would conclude that Defendant's proffered reason was a pretext for discrimination. Accordingly, Plaintiff has failed to rebut Defendant's non-discriminatory reason and summary judgment is therefore granted on Plaintiff's Title VII employment discrimination claim.

<u>Analysis of Title VII Retaliation Claim</u>

Martinez alleges that Defendant retaliated against her by suspending her without pay after she had filed a complaint with the CHRO on December 14, 2006. Martinez also has generally alleged that she complained to Defendant about Minow and Taylor's conduct and as a result her workload increased. To establish a *prima facie* claim for retaliation, the plaintiff must show that (1) she engaged in a protected activity; (2) her employer is aware of the activity; (3) the employer took some adverse action against him; and (4) a causal connection exists

between the protected activity and the adverse action that a retaliatory motive played a party in the adverse employment action. *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001). Retaliation claims are also analyzed using the burden-shifting framework set forth in *McDonnell Douglas.*

In connection with Martinez's general allegation that she complained about Minow and Taylor's conduct and as a result her workload increased, Martinez has failed to support her *prima facie* case of retaliation. Besides the CHRO complaint, Martinez in her deposition testimony only identified one other instance where she complained about Minow and Taylor's conduct around July 2006. However, Martinez testified that she complained to her union representative not to Defendant and that while her union representative wrote up a grievance, she did not know if the grievance was ever filed. In particular, Martinez testified that it was her belief that Buckland "never filed it, but it's been written" [Doc. # 34, Martinez Dep. at 91-92]. Therefore, Martinez cannot demonstrate that her employer knew that she had engaged in a protected activity. The Court notes that the definition of protected activity does encompass "informal protests of discriminatory employment practices," such as "making complaints to management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). However, Martinez's complaint to her union representative cannot be construed to have been a complaint to management. Moreover, there is no evidence in the record that anyone at the library was even aware that Martinez had complained to her union representative. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 129-130 (2d Cir. 2003) ("Neither these assertions nor anything else we have found in the

record would support a reasonable fact-finder's conclusion that Connolly's behavior toward her was retaliatory. Mack has not elicited any evidence to support the notion that Connolly was aware of her complaints to Gallina or Reiff, or that as a result of this awareness he engaged in or escalated the hostile work environment to which he subjected her.  As noted, Local 1 did not file a grievance for Mack while she was employed by Otis because she did not cooperate with Union officials or follow Union procedures with respect to any such grievance."). Accordingly, Martinez has failed to establish a *prima facie* case of retaliation in connection with her alleged July 2006 complaint.

To the extent that Martinez is alleging that her workload increased as a result of her grievance in 1996 regarding working outside her job classification and that she was discriminatorily denied a class update as a result of this grievance, the Court notes that this claim would be time barred as Title VII requires a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action.  Civil Rights Act of 1964, § 706(e), 42 U.S.C.A. § 2000e-5(e).

It is undisputed that Martinez engaged in a protected activity when she filed a complaint with the CHRO and that her employer was aware of the activity.  The Court notes that the Supreme Court has broadened the spectrum of conduct that can qualify as an adverse employment action for retaliation cases.  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-62, 66 (2006).  The Supreme Court has said that for retaliation claims adverse employment action is any employer action that "well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination." *Id.* Here a one-day suspension without pay could arguably defer a reasonable worker from making or supporting a charge of discrimination.

Martinez argues that an inference of causation can be supported by the temporal proximity between her CHRO complaint and the Loudermill Hearing and subsequent suspension. When temporal proximity alone is used to show causation, the proximity must be "very close" in order to support a *prima facie* case of retaliation. *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (20 month period suggested, "by itself, no causality at all"); *see also Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503 (S.D.N.Y. 2010) ("most of the decisions in this Circuit that have addressed this issue have held that lapses of time shorter than even three months are insufficient to support an inference of causation"); *Ghaly v. U.S. Dept. of Agric.*, 739 F. Supp. 2d 185, 200 (E.D.N.Y. 2010) (nine month period between protected conduct and retaliation did not support causation); *Ragin v. E. Ramapo Cent. School Dist.*, No. 05 Civ. 6496, 2010 WL 1326779 at *24 (S.D.N.Y. Mar. 31, 2010) (five month period did not support causation); *but see Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 230 (E.D.N.Y. 2010) (failure to promote retaliation claim occurring just over three months after protected conduct did demonstrate causation where that was the first opportunity for accused to take retaliatory action). Here there was less than month between the filing of Martinez's CHRO complaint on December 14, 2007 and the Hearing that occurred on January 10, 2007 which is sufficient to support an inference of

causation.    Martinez has therefore supported a *prima facie* case of retaliation in connection with her suspension.

As discussed above, Defendant asserts that its decision to discipline Martinez was the result a formal investigation which concluded that Martinez had engaged in conduct that violated the Workplace Violence Policy.    Since Defendant has proffered a legitimate non-retaliatory reason for its decision to suspend Martinez, the burden has shifted back to Martinez to demonstrate that the proffered reason is mere pretext for retaliation.  The Court notes that it is well-established in the Second Circuit that "without more, ... temporal proximity is insufficient to satisfy [a plaintiff's] burden" to rebut defendant's proffered legitimate non-retaliatory reason.  *Simpson v. New York State Dep't of Civil Servs.*, 166 Fed.Appx. 499, 502 (2d Cir. 2006) (*citing Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)).   In addition, the fact that Martinez disagreed with Defendant's conclusion that her behavior during the bathroom incident was inappropriate and violated the Workplace Violence Policy is alone insufficient to create a triable issue of fact.   *See Fleming v. MaxMara USA, Inc.*, 644 F. Supp.2d 247, 266 (E.D.N.Y. 2009) ("First, there is no evidence that defendants' reason for terminating plaintiff's employment is pretextual.   While plaintiff argues that her behavior during the incidents cited by defendants was appropriate and justified, a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact.").

Martinez relies on the same evidence as discussed above to demonstrate that Defendant's decision to discipline her was carried out in retaliation for her CHRO complaint. As noted above, Martinez cannot rely on the alleged racist comments or alleged discriminatory actions of Minow and Taylor to demonstrate retaliatory animus as neither Minow nor Taylor were involved in the decision to discipline Martinez. Martinez also cannot rely on her unsubstantiated belief that everyone involved in the investigation and hearing, including her own union representative Austin, was collaborating against her to demonstrate retaliatory animus. Further, Martinez has not put into evidence any specific facts which demonstrate that Carey, Bodenhofer or Phillips who made the decision to suspend her were driven by a retaliatory animus.

As discussed above, Martinez alleges that "at the hearing, the defendant tried to compel [her] to give up her rights under state and federal law, including withdrawing her pending CHRO complaint, in return for dropping the false claims against her." [Doc. # 43 and Doc. #1, Complaint ¶25]. If this allegation was actually supported by the evidence in the record, Martinez would have likely been able to demonstrate a retaliatory animus. However, as explained above, Martinez's own testimony belies this allegation as she testified that it was her belief that Austin, her union representative, wanted her to "give up her rights" and not any of the individuals who made the decision to discipline her. [Doc. #34, Martinez Dep. 231]. Further, Martinez clarified that what she meant by "give up her rights," was her belief that Austin was in "collaboration" with Carey, "holding secret meetings" while Martinez was waiting for their help in filing a formal

grievance against Taylor and Minow. [*Id.*]. There is no evidence in the record that anyone at the hearing tried to compel Martinez to withdraw her pending CHRO complaint or threatened to discipline her more harshly if she did not withdraw the complaint. Likewise as discussed above, the Court finds that Martinez has failed to support her allegation that "defendant was quite concerned that plaintiff would file a discrimination claim with the Connecticut Commission on Human Rights and Opportunities. On several occasions, the plaintiff was questioned about the matter, including being asked when and by whom her complaint would be filed." [Doc. #43].

Moreover, Defendant has presented evidence which undermines a finding of pretext. Defendant asserts that by December 12, 2007 Carey, Bodenhofer and Phillips had all discussed the results of Carey's investigation of the bathroom incident and preliminary concluded that Martinez should be disciplined with a one-day suspension without pay. They also decided that they would offer Martinez the option of receiving a written warning if she agreed to a management referral to the Employee Assistance Program ("EAP") and would agree to follow their recommendations, if any. [Doc. #32, Ex, D, Phillips Aff. ¶5, 8, Doc #32-7, p.5; Ex. D, Bodenhofer Aff. ¶8]. Therefore, Defendant had preliminarily determined what the appropriate discipline should be prior to Martinez even filing her complaint with the CHRO on December 14, 2007. Martinez presents no evidence that by December 12 Carey, Bodenhofer or Phillips were aware that she was going to be engaging in a protected activity. *See Long v. AT & T Information Systems, Inc.,* 733 F.Supp. 188, 206 (S.D.N.Y.1990) (dismissing retaliation claim

because plaintiff failed to establish that the individuals who fired him had any knowledge of plaintiff's EEOC complaint filed three weeks prior to termination). While Defendant had knowledge of Martinez's CHRO complaint at the January 10, 2008 hearing when they made the final decision regarding what discipline was appropriate, the fact that Defendant did not increase the level of discipline from its preliminary determination suggests that its actions were not driven by a retaliatory animus. If Defendant had come to a preliminary determination regarding discipline and then after learning about the protected activity subsequently changed its mind regarding the discipline, such a course of events could possibly provide evidence of a retaliatory animus. However here, the evidence in the record suggests otherwise. After learning about the protected activity, Defendant did not change its mind regarding the appropriate discipline which suggests that its actions were not motivated by retaliation.

In addition, a finding of pretext is also undermined by the undisputed fact that during the hearing Defendant presented Martinez with a stipulated agreement in which they proposed to lower the discipline to a written warning if Martinez agreed to a management referral to EAP which expressly stated that it did not prohibit Martinez from pursuing her CHRO claim. [Doc. #32, Ex. C, Stipulated Agreement]. Contrary to Martinez's unsubstantiated allegation that Defendant tried to compel her to give up her rights, it appears that Defendant did just the opposite and expressly acknowledged that Martinez should not be prohibited from pursuing her CHRO complaint.

As discussed above, Martinez also attempts to prove pretext through her allegation that she was forced to sign a letter confirming her acknowledgement of her one-day suspension under threat of discharge. [Doc. #43 and Doc. #1 Complaint ¶26]. However, it is unclear to the Court how being forced to sign an acknowledgement of discipline demonstrates that the discipline was motived by a retaliatory animus. Furthermore, as discussed above Martinez testified that the perceived threat came from Austin, her union representative and not from any the individuals who made the decision to suspend her. It also unclear from Martinez's testimony whether Austin actually threatened her with discharge as Martinez testified that Austin told her "Well, listen, you know what, you either sign or you're going to have to go because these people don't want—don't want to wait and I cannot wait either." [Doc. #34, Martinez Dep. 235]. In her deposition, Martinez stated that she interpreted Austin's comment as "It was, like, you sign or you out." [*Id.*].

Even when viewing the facts in the light most favorable to Plaintiff, a reasonable juror would not infer that retaliation was the true reason why Defendant suspended Martinez without pay. The only evidence in the record that supports a finding of retaliation is the temporal proximity between when Martinez filed her complaint with the CHRO and her suspension. Without more, temporal proximity alone cannot prove pretext. Moreover, the mere fact that an employee files a Title VII claim should not in and of itself prevent an employer from enforcing its disciplinary policies in a reasonable manner against that employee. *See Ianetta v. Putnam Investments, Inc.*, 183 F. Supp. 2d 415, 426-427 (D. Mass.

2002) ("It is settled law that if an employer has set a course of action regarding employee discipline, it need not change that course of action because a Title VII claim has been made against it.") (*citing Clark County School District v. Breeden*, 523 U.S. 268, 272 (2001) for the proposition that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence of causality.")). Accordingly, Plaintiff has failed to rebut Defendant's non-retaliatory reason and summary judgment is granted on Plaintiff's Title VII retaliation claim in connection with her suspension.

Lastly, Martinez alleges that after she filed the CHRO complaint her workload increased, that she was assigned all the "dirty work" in the office including the fact that Defendant "heaped many other duties upon the plaintiff that were not part of the plaintiff's job description," and that "Taylor took away telephone responsibilities from plaintiff." [Doc.#43]. However, after reading through Martinez's deposition testimony, Martinez does not specifically identify what duties she was forced to take on after filing her CHRO complaint that were not a part of her job description. As discussed above, the DAS had already found that such tasks filing, transfers, answering phones, annotating books, and dealing with the mail fell within Martinez's job classification. [Doc. #42]. In addition, Martinez supports this allegation with only her own deposition testimony where she conclusory states that her workload was increased and that she was thrown off the phones. Martinez has not provided any specific facts which demonstrate that her workload was actually significantly altered. Based on

the evidence in the record, a reasonable worker would likely not feel dissuaded from filing a discrimination claim after experiencing such a purported increase in workload. While it is arguable that a reasonable worker who receives a substantial increase in his or her workload might be dissuaded from filing a discrimination claim, Martinez has not provided evidence that her workload was substantially increased in a manner that caused any adverse consequences. *Gelin v. Geithner*, No.06-cv-10176, 2009 WL 804144, at *21 (S.D.N.Y. March 26, 2009) (noting that material adversity standard in the retaliation context was not met where plaintiff "suffered no adverse consequences or experienced only trivial harms") (internal quotation marks and citation omitted); *White*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior" simply does not "immunize [him] from those petty slights or minor annoyances that often take place at work and that all employees experience."). Here, there is no evidence in the record that Martinez suffered anything more than a trivial harm after her CHRO complaint was filed. Accordingly, summary judgment is granted as to all of Martinez's retaliation claims.

### Analysis of Title VII Hostile Work Environment Claim

Martinez alleges that she was subjected to a hostile work environment on the basis of her race and national origin. Title VII makes it unlawful for an employer to subject individuals to a discriminatorily hostile or abusive work environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993); 42 U.S.C. § 2000e–2(a)(1). To prove that a workplace is actionably "hostile" under Title VII, a plaintiff must demonstrate that: (1) she "subjectively perceive[d] the environment to be

abusive;" (2) the conduct was so "severe or pervasive" that it created an "objectively hostile or abusive work environment", meaning "an environment that a reasonable person would find hostile or abusive;" and (3) the conduct created an environment abusive to employees "because of their race, gender, religion or national origin." *Harris*, 510 U.S. at 21–22. Plaintiff must demonstrate that her "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment." *Id.*

The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a workplace is so severely or pervasively hostile as to support a Title VII claim. These include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with plaintiff's work; ... whether it unreasonably interferes with the employee's work performance[;]" and "[t]he effect on the employee's psychological well-being[.]" *Id.* at 23.

To determine "whether an environment may be considered sufficiently hostile or abusive to support [a Title VII claim]," courts must consider "the totality of the circumstances." *Williams v. Westchester,* 171 F.3d 98, 100 (2d Cir.1999) (citing *Harris,* 510 U.S. at 23). The factors outlined above must be evaluated "cumulatively" so that the Court can "obtain a realistic view of the work environment." *Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997) (citations omitted). This includes evaluating the "quantity, frequency, and

severity" of the discriminatory incidents. *Id.* "In order to meet [her] burden, the plaintiff must show more than a few isolated incidents of racial enmity[.]" *Williams*, 171 F.3d at 100. Instead, the plaintiff "must establish that [her] workplace was permeated with instances of racially discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult,' such that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.' *Id.* (citations omitted).

Martinez asserts in her complaint that "[c]ommencing in or about 1989 and continuing to the present, Mary Minow…subjected the plaintiff to a hostile work environment" and that "[p]laintiff's supervisor, Carol Taylor, witness many of [Minow's] comments and failed to prevent, stop or address them in any manner whatsoever, despite plaintiff's upset and distress. Instead, Taylor laughed at the offensive remarks." [Doc. #1, Complaint ¶ 8]. In particular, Martinez alleges that Minow made nine derogatory comments about her ancestry and race, has made Martinez cry due to embarrassment on at least one occasion, that Minow and Martinez got in a fight in the bathroom over Minow's coma comment, and that Martinez is constantly assigned all of the "dirty work" in the office. Martinez alleges that this behavior occurred during her entire employment with the library, which has encompassed over twenty years.

First, Martinez has arguably not presented sufficient evidence to establish that she subjectively perceived the environment to be abusive. While Martinez asserts that she coped with anxiety and embarrassment because of the alleged abusive behavior of Minow and Taylor, her position is undermined by her own

deposition testimony where she stated that she was good friends with both Minow and Taylow.  She testified that "I love Carol Taylor. I'm sorry. I have to say yes" and "Mary was one of my favorites in there. I was always looked up to her." [Doc. #34, Martinez Dep. at 110, 123].  Furthermore, Martinez testified that she gave them both birthday cards and that she gave Minow a gift.  [*Id.*].  The fact that Martinez considered herself to be friends with Minow and Taylor is simply incompatible with her allegation that Minow and Taylor had engaged in conduct so severe and pervasive that it altered the conditions of her employment.  In addition, Martinez has presented no evidence that her job performance suffered as a result of the alleged abusive behavior of Minow and Taylor which likewise undermines an inference that Martinez subjectively perceived the environment to be abusive.  *See Miller v. Praxair, Inc.*, No. 3:05-cv-402, 2009 WL 1748026, at *11 (D. Conn. June 18, 2009)("[Plaintiff's] own contention that her job performance never worsened as a result of the allegedly hostile environment is evidence that she did not even subjectively find the environment abusive.").

Second, assuming arguendo that Martinez has demonstrated that she subjectively perceived the environment to be abusive, Martinez has not shown that the "series of incidents were sufficiently continuous and concerted [so as] to have altered the conditions of [her] working environment." *Howley v. Town of Stratford*, 217 F.3d 141, 153-154 (2d Cir. 2000).  Courts in the Second Circuit have found that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 76 (2d Cir,

2001) (internal quotations and citations omitted).   Here, nine specific comments, and potentially four personally upsetting events, occurring over a twenty-year period are not extensive or continuous enough to establish a claim of hostile work environment under Title VII.  *Rios v. Buffalo and Fort Erie Public Bridge Authority*, No.04-cv-375A, 2008 WL 657121, at *3 (W.D.N.Y. March 7, 2008) (finding that behavior complained of was "simply too infrequent and episodic to constitute a hostile work environment" where plaintiff identified "only about six specific instances of misconduct over a thirteen-year period of time"); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 354 (5th Cir. 2001) (holding that eight incidents of racial harassment over a twenty-five month period were not sufficiently severe or pervasive to create a hostile work environment); *see also Thomas v. iStar Financial, Inc.,* 438 F. Supp. 2d 348, 363 (S.D.N.Y. 2006) (noting that the Court need not consider "unsubstantiated allegations" that a supervisor targeted black employees for criticism and concluding that even if all the incidents had occurred, they were nothing more than isolated incidents.).

Lastly, the Court finds that several of the incidents that Martinez details would not reasonably be perceived as hostile or abusive.  A reasonable person would likely not interpret that the workplace was abusive or hostile based on the fact that Martinez once attended a work place party and the only empty seat available was facing the wall.

Here, Martinez at most faced occasional, off-color remarks, and this alone cannot satisfy her burden to prove a hostile work environment.  The infrequency of the comments, the fact that they did not interfere with her work, and her own

statement that she considered herself to be friends with Taylor and Minow indicates that Martinez's work climate was not hostile.  A reasonably jury could not conclude that a hostile work environment existed on the basis of the facts alleged and evidence in the record.  Accordingly, summary judgment is granted as to Plaintiff's Title VII hostile work environment claim.

### Analysis of ADA Claims

Martinez contends that she faced discrimination, retaliation, and a hostile work environment due to her chronic asthma in violation of the ADA.  In particular, Martinez alleges that Defendant refused to raise the temperature in the library to accommodate her asthma which she claims was exacerbated by cold temperatures.  To establish a *prima facie* case under the ADA,[1] she must prove that (1) the Defendant is an employer subject to the ADA, (2) she was disabled within the meaning of the ADA, (3) she was otherwise qualified to perform the essential functions of her job, with or without accommodation, and (4) she suffered an adverse employment action because of her disability. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001).   Here, Martinez cannot establish a *prima facie* case because she fails to demonstrate that she is disabled within the meaning of the ADA.

---

[1] The Court notes that the current version of the ADA incorporates the ADA Amendments Act of 2008 ("ADAAA") which introduced a new standard for evaluating whether an employee was "regarded as having such an impairment." However, the ADAAA applies only to claims arising on or after Jan. 1, 2009. This new definition is not applicable here because Martinez's claims arise in 2006.

The ADA defines "disability" as (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such impairment, or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(1) (2006). "The Supreme Court articulated a three-step process for determining whether a plaintiff has a disability under this subsection of the ADA. First, a plaintiff must show that he suffers from a physical or mental impairment. Second, [she] must identify the activity claimed to be impaired and establish that it constitutes a major life activity. Third, the plaintiff must show that that impairment substantially limits" the major life activity previously identified*." Rumbin v. Association of American Medical Colleges*, No.3:08cv983, 2011 WL 1085618, at *8 (D. Conn. March 21, 2011) (*citing Bragdon v. Abbott*, 524 U.S. 624 (1998)) (internal quotation marks and citation omitted).

Martinez satisfies the first two elements of the ADA definition of "disability." It is not in dispute that Martinez suffers from persistent asthma that requires medication. Second it is not in dispute that asthma affects Martinez's respiratory system limiting her ability to breathe, which is a major life activity. However, Martinez has failed to present evidence that her asthma substantially limited her ability to breath. Whether an impairment "substantially limits" a major life activity depends upon the facts of the particular case and such case-by-case analysis is particularly important in the context of an asthma-related ADA claim. *Castro v. Local 1199, National Health and Human Services Employees Union*, 964 F. Supp. 719, 723 (S.D.N.Y. 1997) ("The requirement of individualized analysis is particularly appropriate in the context of disability claims relating to asthma. As

of 1990, over ten million Americans have been diagnosed with asthma. The severity of asthma varies a great deal among individuals. Symptoms may fall anywhere along the spectrum from mild to life-threatening, and the frequency of asthmatic episodes also varies greatly from person to person. With proper treatment, however, asthmatic symptoms can almost always be controlled.") (internal citation omitted); *Burke v. Niagra Mohawk Power Corp.*, 142 Fed. Appx. 527, 529 (2d Cir. 2005) ("asthma does not invariably impair a major life activity.") (*citing Muller v. Costello*, 187 F.3d 298 (2d Cir. 1999)).

Courts in the Second Circuit have not extended ADA protection to plaintiffs whose asthma was infrequent, controlled by medication, limited to certain catalysts and did not impair their ability to work. *See Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (an employee who had trouble breathing in only one location was not "substantially limited" in her ability to breathe); *Burke v. Niagra Mohawk Power Corp.*, 142 Fed. Appx. 527, 529 (2d Cir. 2005) (an asthmatic employee was not disabled within the meaning of the ADA because her attacks were infrequent, her daily symptoms could be controlled with medication, and the employee did not show that her asthma affected her ability to work in general). Here, while Martinez has provided evidence that her asthma is chronic, she has provided no evidence that she suffered frequent asthmatic episodes at work. Martinez has presented a doctor's note dated March 29, 2007 which states that she has "severe persistent asthma requiring daily medication" and that she should "avoid excessively hot or cold air." [Doc. #32, Ex. B]. However, this doctor's note does not state that Martinez's asthma cannot be controlled by

medication or suggests that Martinez is unable to perform any aspect of her job functions. The Court notes that while Martinez makes general allegations that she was routinely denied an increased in the building's temperature by Defendant, she only identifies three specific instances where she complained of the cold to Taylor during her twenty-year employment with the library which suggests that her asthmatic episodes were not frequent. Moreover, Martinez admitted in her own deposition testimony that the cold building temperature did not affect her ability to perform her job functions. [Doc. #34, Martinez Dep. at 204]. Further, she does not claim that the failure to raise the temperature affected her ability to breath or caused her to suffer an asthmatic attack.

In addition, the Court finds the facts and holding of *Castro v. Local 1199, National Health and Human Services Employees Union* to be pertinent and persuasive to the present case. In *Castro*, the court concluded that an employee whose asthma was affected only by extreme temperatures failed to demonstrate that she was disabled within the meaning of the ADA or that her status as an asthmatic restricted her employment opportunities generally. *Castro*, 964 F. Supp. at 725. The *Castro* court concluded that the plaintiff, who worked as a union organizer, was not required to work in extreme temperatures for the bulk of her time and, when she occasionally had to lead employee demonstrations outside, she was "able to manage." *Id.* The court found that these facts indicated that the plaintiff's asthma did not substantially limit her ability to breathe or restrict her employment generally, and therefore she was not afforded protection under the ADA. *Id.* Martinez like the plaintiff in *Castro* has asthma that is

exacerbated by cold temperatures and is likewise not required to work in extreme temperatures. Furthermore, like *Castro*, Martinez has indicated that her asthma does not affect her ability to work generally, therefore she is also "able to manage," and thus her status as an asthmatic did not restrict her employment opportunities generally. Based on the facts and evidence in the record, a reasonable jury could not conclude that Martinez's asthma substantially limited her ability to breath and accordingly the Court finds that Martinez has not presented evidence demonstrating that she is disabled within the meaning of the ADA.

Even assuming that Martinez is disabled within the meaning of the ADA, the Court notes that Defendant provided Martinez with a reasonable accommodation when they permitted her to bring in a space heater to work. *See Nugent v. St. Lukes-Roosevelt Hosp. Center*, 303 Fed. Appx. 943, 946 (2d Cir. 2008) (Employee's failure to follow up on her proposed accommodation barred her disability discrimination claim against employer under the ADA). The fact that Martinez did not take advantage of the reasonable accommodation offered should also preclude her from maintaining a disability discrimination claim.

The Court notes that a finding that a Plaintiff is not disabled under the ADA does not preclude a retaliation claim under the ADA and that retaliation claims under the ADA are analyzed under the same framework used in Title VII cases. *Lovejoy*, 263 F.3d at 223. "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the

underlying challenged actions of the employer violated [the] law." *Tregalia v. Town of Manlius*, 313 F.2d 713, 719 (2d Cir. 2002) (internal quotation marks omitted) (alteration in original). As discussed above, Martinez can only establish that she suffered an adverse employment action for retaliation purposes in connection with her suspension. However, Martinez fails to present any evidence that demonstrates that the decision to suspend her without pay was in any way related to her asthma. While Martinez does allege that the bathroom altercation was spurred by Minow's coma comment which Martinez interpreted to be a comment about her disability, there is no evidence she was suspended as a result of her disability. Rather, Martinez was suspended as a result of her behavior towards Minow in the bathroom which violated the State's workplace violence policy. Moreover, one stand-alone comment is not enough to support an inference of discrimination, and there is no suggestion that the individuals actually involved the decision to suspend Martinez had exhibited animus toward Martinez in regard to her asthma or factored her asthma into their disciplinary decision. *See e.g. Rosinski v. Am. Axle & Mfg., Inc.,* 402 Fed. Appx. 535, 538 (2d Cir. 2010) (Plaintiff's claims under the ADA failed because "she did not provide any evidence that any of the adverse actions taken against her had anything to do with any disability she may have had or have been perceived to have"). Therefore, the court finds that a reasonable jury could not conclude based on the facts alleged and the evidence in the record that Martinez suffered an adverse employment action because of her asthma. Accordingly, summary judgment is granted on all of Plaintiff's ADA claims.

The Defendant raises an affirmative defense with respect to Martinez's ADA claim.  Defendant asserts that claims brought under Title I of the ADA are barred by the Eleventh Amendment and sovereign immunity principles and to the extent that Martinez is seeking money damages she is barred from doing so by the Eleventh Amendment. [Doc. #37].   Since the Court has granted summary judgment on Plaintiff's ADA claims based on substantive grounds, the Court need not address whether Defendant is entitled to this affirmative defense.

<u>Analysis of CFEPA Claims</u>

Martinez alleges that she faced discrimination, retaliation, and a hostile work environment based upon her race, ethnicity and national origin in violation of CFEPA. The standards governing discrimination, retaliation, and hostile work environment under CFEPA are the same as those governing Title VII.  *See Craine v. Trinity College*, 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.");  *State v. Commission on Human Rights and Opportunities,* 211 Conn. 464, 470 (1989) (The intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case law for guidance in interpreting that provision of the CFEPA); *Brittell v. Dep't of Correction,* 247 Conn. 148, 165-168 (1998) (the standards governing a hostile work environment claim under the CFEPA are the same as those governing a claim under Title VII). Therefore the foregoing analysis regarding Martinez's Title VII claims applies to Martinez's

corresponding CFEPA claims and accordingly the Court likewise grants summary judgment on Martinez's discrimination claims under CFEPA.

Martinez also asserts a claim of discrimination based on her alleged disability under CFEPA. While Connecticut courts apply the same standards under the ADA to analyze CFEPA disability claims, Connecticut courts have interpreted CFEPA's definition of "disability" to be significantly broader than the ADA's definition of "disability" because CFEPA does not require that the chronic impairment "substantially limit" a major life activity. *Grunberg v. Quest Diagnostics, Inc.*, No.3:05-cv-1201, 2008 WL 323940, at *4 n.2 (D. Conn. Feb. 5, 2008). "CFEPA … provides that '[p]hysically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness....The statute does not define 'chronic,' but courts have defined it as 'marked by long duration or frequent recurrence' or 'always present or encountered.' ... With reference to diseases, the term 'chronic' has been defined to mean 'of long duration, or characterized by slowly progressive symptoms; deep-seated or obstinate, or threatening a long continuance; distinguished from acute.'" *Logan v. SecTek, Inc.*, 632 F. Supp. 2d 179, 184 (D. Conn. 2009) (*quoting* Conn. Gen. Stat. § 46a-51(15)).

For Martinez to be protected under CFEPA, her asthma must have been a chronic impairment. When viewing the facts in the light most favorable to the plaintiff, a reasonable jury could infer that Martinez's asthma was a chronic impairment because she has had her asthma for ten years, her asthma has been

of such a severity that an attack once placed her in a coma, and she continues to have asthma to this date. *See Gomez v. Laidlaw Transit, Inc.,* 455 F. Supp. 2d 81, 88 (D. Conn. 2010) (a reasonable jury could infer that the plaintiff's asthma was "chronic" under CFEPA because she produced evidence which suggested that her asthma was marked by long duration, such as that she had had it since childhood, exhibited severe symptoms during her employment, and continued to have the condition to that present).

In order to succeed on her CFEPA disability claim, Martinez must demonstrate that she suffered an adverse employment action because of her disability. As discussed above, the Court does not find that Martinez suffered an adverse employment action when she was denied a class update or was suspended for one-day without pay for purposes of her substantive employment discrimination claim, but that Martinez did suffer an adverse employment action when she was suspended for purposes of her retaliation claim. Assuming arguendo that Martinez did suffer an adverse employment action for her substantive employment discrimination and her retaliation claims when they suspended her, as discussed above, Martinez has presented no evidence that demonstrates that the decision to suspend her without pay was in any way related to her asthma. Therefore, the court finds that a reasonable jury could not conclude based on the facts alleged and the evidence in the record that Martinez suffered an adverse employment action because of her asthma.

Further as discussed above, Defendant provided Martinez with a reasonable accommodation for her asthma when they allowed her to use a space

heater. Martinez has not indicated why a space heater was unsatisfactory to accommodate her request that the temperature be raised, and she has not detailed any other reasonable accommodation which could have alleviated the temperature in the building and yet was denied. Martinez's failure to follow up on the proposed accommodation should also bar her disability discrimination claim under CFEPA. *See Nugent v. St. Lukes-Roosevelt Hosp. Center*, 303 F. App'x 943, 946 (2d Cir. 2008). For the foregoing reasons, the Court grants summary judgment on all of Martinez's disability discrimination claims under CFEPA.

<u>Analysis of Intentional Infliction of Emotional Distress</u>

Martinez asserts a cause of action for intentional infliction of emotional distress ("IIED") against Defendant. However since the Defendant is a state library, Plaintiff's claim is barred by the doctrine of sovereign immunity. In order to be subject to suit in federal court, a state must expressly and unambiguously waive its Eleventh Amendment immunity or Congress must clearly express its intention to revoke the immunity in language of a particular statute. *Martires v. CT Dept. of Trans.*, 596 F. Supp. 2d 425, 445 (D. Conn. 2009) (*citing Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304-305 (1990)). While Connecticut has expressly waived its sovereign immunity in regard to discrimination claims brought under CFEPA, for example, Connecticut has not waived its sovereign immunity from the common law claim of IIED. *Oppedisano v. Southern CT State Univ.,* No. 3:07-cv-1693, 2009 WL 1605904, at *3-4 (D. Conn. June 5, 2009) (*citing Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 447-448 (2d Cir. 1999); *Gaynor v. Martin*, 77 F. Supp. 2d 272, 281-282 (D. Conn. 1999)). As

a result, Martinez cannot maintain a cause of action against the State of Connecticut State Library for intentional infliction of emotional dress and summary judgment is hereby granted on that claim.

**Conclusion**

Based upon the above reasoning, the Defendant's [Doc. #32] motion for summary judgment is GRANTED and all of Plaintiff's claims have been accordingly dismissed.


IT IS SO ORDERED.


_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge


Dated at Hartford, Connecticut: September 21, 2011